## THE NORTH STAR.

(District Court, S. D. New York. April 9, 1909.)

SHIPPING (§ 166*)—INJURIES TO PASSENGER—EVIDENCE—DAMAGES.

Personal injury to a child through stumbling on a mat at an entrance to a saloon of a passenger steamer and wounding her forehead. She was in the charge of her mother and a nurse and in going carefully from the latter to the former met with the accident, which happened a little after 7 o'clock, on the 23d of August, 1907. A conflict of testimony with respect to the lighting of the cabin and passageways determined in favor of the libellant's contention that there was an absence of artificial light which rendered the passageway dark and unsafe and caused the accident. Also *held* that the caretakers of the child were not negligent and that there was no contributory negligence. The sum of $600, allowed to the libellant to compensate the child for her suffering and the remains of a scar.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 549, 551; Dec. Dig. § 166.*]

(Syllabus by the Judge.)

Davies, Stone & Auerbach, for libellant.
Carpenter, Park & Symmers, for claimant.

ADAMS, District Judge. This action was brought by the father, as guardian ad litem, of Evelyn Allen, an infant about 4 years of age, against the steamship North Star, to recover $5,000 for the injuries she sustained on or about the 23d of August, 1907, by reason of the saloons and passageways of the steamer being insufficiently lighted, whereby she stumbled over a mat at the exit from a passageway leading from the saloon to the promenade deck. The answer denies that there was any defect in the light and alleges that the accident happened through the child being left unattended and stumbling over a cocoanut mat placed at the entrance to the main saloon, striking her forehead upon the sill of the door, slightly bruising or cutting her forehead. It further alleges that no obstructions whatsoever were placed in any of the passageways or saloons of the vessel, and that the vessel nor any of her officers or crew was in any way responsible for the accident.

The testimony shows that the North Star was a well equipped modern steamer, making regular trips between New York and Portland. She had commodious cabins with facilities for fully lighting by electricity her cabins and the passages leading to them.

The mother of the infant and two other children, with two nurses, were returning on the steamer to New York from a summer sojourn in Maine on the way to their home in East Orange, New Jersey. When nearing New York, Mrs. Allen went outside of the cabin upon the starboard side of the vessel, to watch for her husband, whom she expected to meet her. She occupied a stool near an entrance to the cabin, her children being with her. One of the nurses was sitting in the passage leading to the outside in charge of a suit case, containing Mrs. Allen's valuables. The children at first were with their mother but a stir being created inside by a passenger's loss of some minor article of jewel-

ry, the children went in there and Evelyn remained with the nurse, the other two returning to the mother. Subsequently, a few minutes before the landing of the steamer, Evelyn also started to go to her mother, eight or ten feet distant, and before reaching her met with the accident.

The absent members of the family were expected in New York on the date mentioned at about 5:30 p. m., and the father, with his brother, went to the steamer's pier, No. 32 East River, to meet them. The steamer did not arrive on time and when she reached the vicinity of the pier, about 6:30 p. m., owing to a strong ebb tide, she was not at first able to make a landing, and drifted down the river to the vicinity of the Brooklyn Bridge. She was then assisted by two tugs and turning around proceeded to the pier, to which she was made fast and landed her passengers about 7:25 p. m. It was sunset about 6:47 o'clock and when the steamer was manœuvering it was growing dark. Where there was any obscuration of what light remained, it became quite dark, so that it was difficult to see anything on the floor of the cabin of the steamer, for example. The claimant of the steamer strenuously insists that the electric lights were turned on, while the libellant with equal positiveness asserts that while the navigation lights of the steamer were properly displayed, those within the vessel were neglected, with the result that the interior of the cabin and the passageways leading thereto were dark and unsafe.

The contention on the part of the libellant is principally supported by him, by his brother, by the child's mother and her nurse; also by an entirely disinterested witness, a passenger named Hughes, who said he was getting ready to go ashore when he heard the scream of the child, saw her being picked up from a position on the mat with her head against the sill of the door. He further said:

"It was dark, dark as twilight. * * * It was more light outside; it was dark inside, twilight. * * * You couldn't distinguish the fibre mat from the carpet or covering that was on the floor of the saloon; as a matter of fact, when I went over to help the child I stumbled against the mat."

This statement of the condition of affairs is supported to a certain degree by the libellant's other witnesses and there is very little to meet it on the part of the steamer. But two witnesses testified directly to the burning of the lights. One was a former steward of the vessel, who said they were lighted, but on the cross said he was merely testifying from the custom and his belief that he followed it on this occasion. The other was more specific, but his testimony cannot be believed in the face of the more convincing testimony of the libellant's witnesses. I conclude therefore that the lights were not burning and that the place of the accident was not properly illuminated.

The claimant contends that even if the conclusion just mentioned should be reached, the caretakers of this child were grossly negligent in allowing such an infant to roam about unattended on board of a steamship and that the accident to the child is entirely attributable to such negligence.

It is well settled that a child of four years of age is non sui juris (McGarry v. Loomis, 63 N. Y. 104, 106, 20 Am. Rep. 510) and in order to establish this contention, it is incumbent upon the claimant to show

some negligence, contributing to the accident, which can be imputed to the child. The claimant's allegation is that allowing the child to go from the mother to the nurse and back again was such negligence, but I am unable to see how that can be so. This was a well conducted quiet child. It does not appear that she did anything but walk back and forth in a reasonably careful manner. Any one might have stumbled over the mat under the circumstances. The testimony shows that Mr. Hughes, a man of discretion and experience, struck the mat with his foot and while no injury resulted to him, the fact is persuasive that any one, no matter how careful, might have met with some such accident as attended the child's stumbling over the mat. This contention should also be disposed of adversely to the steamer.

There remains to be determined the amount of damages recoverable for the child. The contention on the part of the libellant is that substantial damages should be allowed, while the claimant urges that the child's injuries were trivial. It appears that she received quite a severe cut above the left eye, which laid open the skin as far as its depth would permit.

The wound was described by an attending physician, a witness for the plaintiff, as follows:

"Q. So far as you recollect, describe the condition of the child with respect to any physical injuries which you may have observed at that time? A. Why, I observed a cut, a small sized wound on her forehead, which was approximately parallel to the left eyebrow, situated about an inch above the eyebrow, I should say about three-quarters of an inch in length and in depth extending down to the bone—to be more accurate, to part of the periosteum covering of the bone."

It was unquestionably very painful at the time, and doubtless continued so for several days, then left the child depressed and drowsy. The wound caused profuse bleeding at the time it was received and some subsequent, but not very severe, bleeding in the process of dressing. It left a slight scar which the libellant claims is permanent. One physician said "there would probably be some scar there." This physician was succeeded by another who testified that the child had suffered from shock and loss of blood, had not improved as he had wished, and from what he observed on September 11th, 1907, and thenceforward during six weeks, she was in a condition which was "due to the injuries which I observed she had evidences of on her forehead." This is about all the evidence the libellant produced with respect to the scar. The child was in court at the time of the trial, January 22, 1909, and I then examined her forehead and saw but slight remains of the scar although the marks of its existence were discernible.

It is also claimed that the child was in an anæmic condition from the injury but the evidence of such condition was not strong. It was vigorously disputed and I think, if it existed at all, it is quite doubtful if it remained for any length of time. She would naturally be pale and languid after the loss of a large quantity of blood, but as far as anything in the nature of a permanent injury of this kind is concerned, I think it may safely be concluded that there was none.

Altogether, considering the child's suffering from the pain and the

loss of blood, and making some allowance for the remains of the scar, I think the sum of $600 will be sufficient to remunerate her. I therefore allow a decree for the libellant for that amount.